IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GRETCHEN FRYE, Administratrix of the Estate of ROSS S. FRYE, Deceased, on behalf of the estate of ROSS S. FRYE and on behalf of the Wrongful Death Heirs, | Case Number |
| Plaintiff, | |
| v. | |
| ORLANDO HARPER, individually and in his official capacity as Warden of the Allegheny County Jail; ALLEGHENY COUNTY; ROBERT PRISTAS; individually and in his official capacity as a correctional officer of the Allegheny County Jail; ANDREW RUFFNER, individually and in his official capacity as a correctional officer of the Allegheny County Jail; SIMON WAINWRIGHT, individually and in his official capacity as Deputy Warden of the Allegheny County Jail; J. DOE #1, individually and in his/her official capacity of Shift Supervisor; J. DOE #2, individually and in his/her official capacity of Commanding Officer, | |
| Defendants. | |

## COMPLAINT IN CIVIL ACTION

AND NOW comes Plaintiff, GRETCHEN FRYE, Administratrix of the Estate of ROSS

S. FRYE, Deceased, on behalf of the Estate of ROSS S. FRYE, and on behalf of the wrongful

death heirs, by and through her attorneys, STEVEN M. BARTH, ESQUIRE and JONATHAN

M. GESK, ESQUIRE and files the following COMPLAINT:

## PARTIES

1.      Plaintiff, GRETCHEN FRYE, is an adult individual residing in Allegheny

County, Pennsylvania.

2.      On or about February 6, 2018, Plaintiff was granted letters of administration and appointed Administratrix of the Estate of ROSS S. FRYE by the Court of Common Pleas of Allegheny County at No. 21800801.

3.      Plaintiff, as the Administratrix of the Estate of ROSS S. FRYE, deceased, brings this action on behalf of all persons entitled to recover damages for the wrongful death of ROSS S. FRYE, pursuant to 42 Pa. C.S.A. SECTION 8301.  Plaintiff also brings this action to recover damages on behalf of the Estate of ROSS S. FRYE pursuant to 42 Pa. C.S.A. SECTION 8302.

4.      The names of all persons entitled by law to recover damages for the death of ROSS S. FRYE and their relationship to the Decedent are listed as follows:

        a.)      Tiffany Frye (daughter)

        b.)      Ross Frye, Jr. (son)

        c.)      Kayla Frye (daughter)

        d.)      Dasia Frye, a minor (daughter)

5.      During his lifetime, ROSS S. FRYE did not commence any action to recover damages for the injuries which caused his death and no other action has been filed to recover damages for the injuries and wrongful death of ROSS S. FRYE.

6.      At all times relevant hereto, Defendant, ORLANDO HARPER (hereinafter "Defendant HARPER"), was the Warden of the Allegheny County Jail, charged with the control and supervision of all guards employed within the jail.  As such, he was responsible for the training, supervision, direction, procedures and conduct of all guards and was responsible for the health, safety, and adequate medical treatment of inmates within the Allegheny County Jail.

7.      At all times relevant hereto, Defendant, HARPER was responsible for creating and executing policies to ensure the safety, health, and availability and provision of adequate medical treatment to all inmates within the Allegheny County Jail.  Accordingly, Defendant

HARPER was responsible for formulating and implementing jail guard procedures to protect the safety, health, availability and provision of adequate medical treatment to inmates.

8.      At all times relevant hereto, Defendant HARPER represented the legal authority and official policy of ALLEGHENY COUNTY pertaining to guard actions, duties, responsibilities, training, procedures, supervision, regarding the safety, health, availability and provision of adequate medical treatment of inmates.  As such, Defendant HARPER acted under color of state law in those regards.

9.      At all times relevant hereto, Defendant. SIMON WAINWRIGHT (hereinafter referred to as "Defendant WAINWRIGHT"), was the Deputy Warden of the Allegheny County Jail and reported directly to Defendant HARPER in the chain of command for this jail.

10.     Defendant WAINWRIGHT was in charge of the operation of the security functions of the Allegheny County Jail which includes topics such as what tools are available on pods for correctional officers who do rounds as well as if an inmate can be housed alone while in an intake pod.

11.      Defendant, CO ROBERT PRISTAS (hereinafter referred to as "CO PRISTAS"), is an adult individual who at all times relevant hereto was employed by Defendant ALLEGHENY COUNTY as a Corrections Officer for the Allegheny County Jail and was one of the correctional officers in charge of pod 4A in September 2017 and was responsible for managing, implementing policy, supervising, making rounds, and /or other relevant activity to provide adequate safety and protection to inmates from other inmates.

12.     Defendant, CO ANDREW RUFFNER (hereinafter referred to as "CO RUFFNER"), is an adult individual who at all times relevant hereto was employed by Defendant ALLEGHENY COUNTY as a Corrections Officer for the Allegheny County Jail and was one of the correctional officers in charge of pod 4A in September 2017 and was responsible for

3

managing, implementing policy, supervising, making rounds, and /or other relevant activity to provide adequate safety and protection to inmates from other inmates.

13.     At all times relevant hereto, Defendant, J. DOE #1 (hereinafter referred to as "Defendant DOE"), was the Shift Supervisor in charge of pod 4A in September 2017 and was responsible for managing, implementing policy, supervising, making rounds, and /or other relevant activity to provide adequate safety and protection to inmates from other inmates.

14.     At all times relevant hereto, Defendant, J. DOE #2 (hereinafter referred to as "Defendant DOE"), was one of the commanding officers on pod 4A in September 2017 and was responsible for managing, implementing policy, supervising, making rounds, and /or other relevant activity to provide adequate safety and protection to inmates from other inmates.

15.     At all times relevant hereto, Defendants HARPER, WAINWRIGHT, J. DOE #1, J. DOE #2, PRISTAS, and RUFFNER, and their agents, servants, and/or employees were responsible for creating and implementing procedures, policies, guidelines, and practices for timely jail guard and/or jail personnel referrals of inmates suffering from adverse medical conditions to the jail infirmary to protect the health and safety of inmates.

16.     In providing for this determination by jail guard and/or jail personnel, all Defendants represented the legal authority and official policy of ALLEGHENY COUNTY, and acted under color of state law.

17.     At all times relevant hereto, all of the Defendants, and their agents, servants and/or employees were responsible for creating and implementing procedures, policies, guidelines, and practices for timely referrals of inmates by infirmary personnel to outside medical providers which the medical facilities and personnel at the Allegheny County jail infirmary are inadequate to address an inmates' medical condition.

4

18.     In providing for this determination to be made by infirmary personnel, all of the Defendants represented the legal authority and official policy of ALLEGHENY COUNTY and acted under color of state law.

19.     At all times relevant hereto, the Defendant, ALLEGHENY COUNTY, was a local state agency organized and existing under the laws of the Commonwealth of Pennsylvania, authorized to and maintaining the Allegheny County Jail for the purposes of safely detaining, incarcerating and rehabilitating citizens and inhabitants of Allegheny County.

20.     At all times relevant hereto, all of the named Defendants are agents, servants, and/or employees of ALLEGHENY COUNTY.

21.     At all times relevant hereto, Defendant ALLEGHENY COUNTY acted through its agents, servants, and employees.

22.     By virtue of its conduct, through its agents, servants, and employees, in detaining, incarcerating, protecting and rehabilitating inmates at the Allegheny County Jail, Defendant, ALLEGHENY COUNTY, expressly assumed the duties of maintaining the health and safety of inmates in regards to the provision and availability of adequate medical care and maintenance of clean, healthful, and safe conditions at the Allegheny County Jail.

23.     By virtue of its conduct, in the creation and management of the Allegheny County Jail, Defendant, ALLEGHENY COUNTY, expressly assumed the duties of maintaining the health and safety of inmates in regards to the provision and availability of adequate medical care and maintenance of clean, healthful, and safe conditions at the Allegheny County Jail.

24.     The maintenance of clean, healthy, and safe conditions and the provision of adequate medical care to inmates within the Allegheny County Jail are operations and functions of the Defendant, ALLEGHENY COUNTY.

## FACTS

25.    Each of the above paragraphs is incorporated herein by reference.

26.    According to the chair of the Jail Oversight Board, Judge David Cashman, the Allegheny County Jail functions as not only as a place of incarceration but a mental health hospital.

27.    The Allegheny County Jail houses all citizens or members of the public who are accused of violating the law which includes such charges as misdemeanors, driving under the influence, domestic disputes, summary offenses, felonies and murder to name a few.

28.    At all times relevant hereto, all Defendants knew that in 2011 that a federal Bureau of Justice study found that among the nation's 50 largest jails, the Allegheny County Jail had the second highest suicide rate from 2000 to 2007, averaging 1 2/3 suicides a year.

29.    At all times relevant hereto, all Defendants knew or should have known the following:

  a.    Bruce Dixon, M.D., wrote an article entitled "An Analysis of Jail Suicides 1981 to 2010" for Allegheny County Jail. In this report, Dr. Dixon states that from 1981-1990 there were 20 suicides, from 1991-2000 there were 8 suicides, from 2001-2010 there were 19 suicides. In Dr. Dixon's analysis, he states that he talked to several observers who pointed out to him during the years when there were no suicides they were characterized by intensive correctional staff training and his review supports that position. Years where more suicides occurred appear to be during times of change in senior administration and training was allowed to lapse. In his analysis, Dr. Dixon acknowledges that correctional staff are the first eyes on inmates and intensive training is necessary to give them the skills to detect and alert medical personnel to potential suicides. See Paper marked as Exhibit 1.

  b.    In 2007-2008, Jason Kindler and John Simeone passed away because of suicide while in custody at the Allegheny County Jail in pods 4 C and 4B (intake pods) as well as others. After these suicides, double celling and 15-minute rounds by inmate workers were implemented to help officers on the pod monitor the inmates for suicidal behavior.

  c.    It is particularly important to watch intake pods for suicides

30.     In 2012, senior leadership changed at the Allegheny County Jail where Defendant

Harper and Defendant Wainwright began their jobs as warden and deputy warden.

31.     According to Defendant Harper's previous sworn testimony in 2017, the following

is noted when he took over at the Allegheny County Jail:

```
Q. You would agree with me, when you first started at the
jail, after being there a couple weeks, you understood there
was a need for you to make significant changes?

A. There were changes that I deemed necessary that needed to
be made.

Q. And after you arrived, you did an evaluation, and the
determination you came to was that employees were violating
policies and procedures, and they should be held accountable for
the policies that they were violating?

A. Yes.

Q. And you would agree when you came there in October 2012,
people were not being disciplined the way that you would hold
them accountable?

A. Yes.
....

Q. And you would agree with me that there were no employee
evaluations being done at ACJ until sometime in 2013?

A. Yes.

Q. An employee evaluation is a way in which a manager can
inform the employee of the manager's expectations and how the
employee is doing?

A. Yes.

Q. You would agree that if there is a policy, it should be
strictly enforced?

A. Yes.
```
See trial transcript marked as Exhibit 2.

32.     It believed at that time that intensive suicide prevention training as well as reinforcement of necessary policies and procedures lapsed as it pertained to preventing suicides at the Allegheny County Jail during this senior leadership change in 2012/2013.

33.     As a result of this change/upheaval at the Allegheny County Jail, the requirements made in 2007/2008 to require double celling in intake pods (4A/B/C) for inmates as well as making 15 minute rounds lapsed.

34.     All of the Defendants knew or should have known that approximately half of the suicides that take place within jails and prisons are in single cells.

35.     From January through September 2017, 2 suicide deaths occurred at the Allegheny County Jail, while 10 others have attempted suicide but survived, according to statistics from the Allegheny County Jail Oversight Board:

     a.     1 suicide attempt in January, 2017;

     b.     1 suicide attempt in April, 2017;

     c.     5 suicide attempts in May, 2017;

     d.     3 suicide attempts in June, 2017;

     e.     April 2017 death of Jamie Gettings by suicide in the medical housing unit;

     f.     June 2017 death of Joel Velasquez-Reyes by suicide in the medical housing unit.

36.     Due to the deaths of Ms. Gettings by suicide in April 2017 and Mr. Velasquez-Reyes by suicide in June of 2017, Defendant Allegheny County, Defendant Harper, and Defendant Wainwright, made the following determinations and/or changes and/or changes in staff:

     a.     Veronica Brown was terminated for cause due to the circumstances of Ms. Gettings's death;

b.     Kenneth L. Goings was terminated for cause due to the circumstances of Mr. Velasquesz-Reyes's death;

c.     Defendant Warden increased the number of correctional officers working the medical unit from one to two, and mandated that they do rounds of the cells every 15 minutes, rather than the prior policy of checking inmates every 30 minutes.

d.     It is believed that CO Brown and CO Goings did not receive the proper training and required training to make suicide prevention a priority at the Allegheny County Jail.

37.     It is believed that the following changes were not made even though the Defendants knew or should have known that inmates were at a substantial risk of harm of suicide in the intake pods (4A) which they knew since 2007/2008 (when Jason Kindler and John Simeone passed away):

a.     The intake correctional officers did not receive intensive training on suicide prevention.

b.     The intake correctional officers did not receive performance evaluations in order to assist them in the performance of their jobs.

c.     The intake correctional officers did not take "cut down" tools and/or keys with them on the rounds they made even though they knew that these tools are life-saving in either cutting down the victim or accessing the cell.

d.     The intake correctional officers did not do rounds every 15 minutes on the intake pod.

e.     The intake correctional officers single celled inmates in intake even though the Allegheny County Jail knew from previous litigation on Kindler and Simeone that no inmate should be single celled in intake due to suicide increased risk.

f.     The initial evaluation performed at intake did not convey the necessary information to the intake correctional officers in order to perform the appropriate suicide prevention policy.

g.     Reckless indifference to all inmates in pod 4A who were single celled which created a substantial risk of harm to all inmates who were single celled for suicide.

38.     At all times relevant hereto, all Defendants were required to adhere to and enforce the following policy and procedures:

a.)     All Defendants must consider suicide prevention as one of the highest priorities of service within the correctional setting;

b.)     All Defendants must work together to identify inmates at risk for suicide;

c.)     All Defendants will have an outlined program for responding to suicidal individuals;

d.)    All Defendants must learn about an inmates' high risk periods immediately upon admission to a facility;

e.)    All Defendants must learn about an inmates' high risk periods after adjudication, when the inmate is returned to a facility from court;

f.)    All Defendants must learn about an inmates' high risk periods following the receipt of bad news regarding self or family;

g.)    All Defendants must learn about an inmates' high risk periods after suffering from some type or form of humiliation, rejection or abuse;

h.)    All Defendants will review information of newly arriving inmates in this institution concerning issues related to suicide;

i.)    All Defendants conducting the intake personal screen will be continuously alert to suicidal behavior;

j.)    All Defendants will train their staff who work with inmates to recognize verbal and behavioral cues that indicate the potential for suicide;

k.)    All Defendants who recognize an inmate as being potentially suicidal are to request immediate evaluation of the patient through the nursing or mental health staff;

l.)    All Defendants' staff who recognize an inmate as being potentially suicidal are to request immediate evaluation of the inmate through the nursing mental health staff on the medical/mental health pods;

m.)    All assessments of potentially suicidal inmates to be conducted by qualified mental health professionals, trained to determine an inmate's level of suicide risk;

n.)    Inmates who have been determined to be suicidal should be placed/housed according to institutional policy and procedures for the monitoring of such individuals within the correctional setting. Regular documented supervision should be maintained;

o.)    Inmates who have been determined to be suicidal should be placed/bound in the appropriate acute mental health housing within either 5C Acute Male or 5MD Acute Intermediate Female (and 5D Acute Male when opened).  Regular, documented supervision should be maintained.

p.)    Suicidal inmates should not be housed alone, or left alone, unless constant supervision can be maintained. If constant supervision cannot be provided when needed, the inmate should be housed with another resident or in a dormitory and checked every 10 to 15 minutes by correctional staff. However, the rooms should be as nearly suicide proof as possible. Ideally, constant supervision by a staff member is preferable;

q.)    The procedures for referring potentially suicidal inmates and attempted suicides to mental health care providers or facilities should be clearly outlined;

r.)    Clear, current and accurate information regarding an inmate must be communicated between health care personnel and correctional personnel pursuant to the procedures of communication;

s.)    The intervention plan on how to handle a suicide that is in progress, including appropriate first aid measures, should be clearly outlined;

t.)    Procedures for notifying correctional administrators, outside authorities and family members of potential, attempted or completed suicides will be in place;

u.)    Procedures for documenting the identification and monitoring of potential or attempted suicides will be detailed, as well as procedures for reporting a completed suicide;

v.)    The suicide plan should specify the procedure for medical/administrative review if a suicide does occur.

w.)    A formal psychiatric/suicide review should take place following all successful suicides, or significant suicide attempts.

39.    On September 16, 2017, Decedent was being held at the Allegheny County Jail on charges for indecent exposure and open lewdness.

40.    During the intake process, Decedent informed the employees of the intake process that he had prior psychiatric treatment, prior suicide attempts, addiction, suicidal thoughts, suffered from depression, drug use within days of incarceration and previously been hospitalized multiple times for psychiatric treatment.

41.    At all times relevant hereto, Decedent informed the necessary people that he needed mental health treatment during his incarceration.

42.    At all times relevant hereto, Decedent signed a consent form to be treated for mental health issues while incarcerated by Defendants.

43.    At all times relevant hereto, Defendants knew that Decedent required medication for his mental illness.

44.    At all times relevant hereto, all of the Defendants knew or should have known the following:

a.    Decedent Plaintiff treated extensively at Mercy Behavioral due to severe depression and mental health issues;

b.    Decedent Plaintiff had a 20-25 year history of addiction issues with drugs/alcohol abuse;

c.    Decedent Plaintiff attempted suicide in approximately 2012-2014 time frame and received mental health treatment related to this attempt;

d.    Decedent Plaintiff's history of depression required extensive treatment.

11

45.     At all times relevant hereto, all Defendants recognized and knew that Decedent previously attempted suicide previously and that he required ongoing mental health and psychiatric treatment.

46.     At all times relevant hereto, all Defendants recognized Decedent as being potentially suicidal and recommended evaluation of Decedent through the nursing mental health staff.

47.     In the alternative, the assistant nursing director knew or should have known that Decedent required mental health and/or medical intervention at some time before September 19, 2017.

48.     It is believed that initially all the Defendants should have recognized and considered the Decedent as potentially suicidal but assigned Decedent to a general population pod/intake pod without the necessary safeguards for a suicide threat.

49.     In housing inmates at a substantial risk for suicide such as Decedent, all Defendants knew that they should not be housed alone or left alone unless constant supervision can be maintained, preferably by a staff member at minimum every 15 minutes for a visual check.

50.     Decedent was never assigned a cellmate in the general population, specifically the intake pod 4A.

51.     At all times relevant hereto, all Defendants allowed the Decedent to have items that he could use to hang himself while single celled.

52.     Sometime on or about September 19, 2017, Decedent while single celled was left alone in his cell for an undetermined amount of time wherein he hung himself.

53.     At all times relevant hereto, Defendant CO Pristas and Defendant CO Ruffner did not conduct 15 minute rounds, did not carry cut down tools and/or keys with them when they did rounds, and/or did not adhere to the policy of no single cell housing of inmates in intake.

54.     It is believed that the Defendant Cos did not receive the necessary reinforcement of policies and procedures relating to suicide prevention from the Defendant J. Doe #1 or Defendant J. Doe #2.

55.     It is believed that Defendant J. Doe #1 or Defendant J. Doe #2 did not receive the necessary instructions, education, reinforcement, orders and/or policies and procedures from their supervisors, Defendant Wainwright and Defendant Harper.

56.     It is believed that the assistant nursing director knew or should have known of the substantial risk of harm posed to the Decedent by being single celled in the intake pod.

57.     At all times relevant hereto, all Defendants did knowingly disregard the objective and/or excessive risk the Decedent posed to his own safety and health while incarcerated at the Defendants' facility, the Allegheny County jail.

58.     At all times relevant hereto, during the course of Decedent's detention, the Defendants failed to recognize that the Decedent presented an objective and/or excessive risk of suicide.

59.     At all times relevant hereto, all of the Defendants knew or should have known that a single celled inmate in the intake pod was at an increased substantial risk for suicide which they have known for decades.

60.     At all times relevant hereto, all of the Defendants allowed to lapse policies and procedures put in place in 2007/2008 which helped prevent suicide rates from rising at the Allegheny County Jail.

61.     At all times relevant hereto, all of the Defendants knew or should have known of the prior litigation as well as study by Dr. Dixon which provided notice to all Defendants of the substantial risk of harm suicide presented in the Allegheny County Jail when intensive suicide prevention was allowed to lapse as well as a change in leadership.

62.     At all times relevant hereto, Defendants failed to be continuously alerted to Decedent's suicidal behavior.

63.     At all times relevant hereto, during the course of Decedent's detention, the Defendants failed to respond properly or adequately to the objective and/or excessive risk of suicide posed by the Decedent.

64.     It is believed that the failure to have the proper cut down tools and/or the keys and/or perform the correct time for rounds factually caused the death of the Decedent and prevented the Defendants from rendering the proper first aid to him in order to prevent his death.

65.     From September 19, 2017 through September 22, 2017, the Decedent was on life support due to his suicide attempt.

66.     On or about September 22, 2017, the Decedent passed away from suicide at the Allegheny County Jail.

67.     At all times relevant hereto, Gretchen Frye, the mother of the Decedent, did not receive any notification from the Allegheny County Jail regarding the death of her son, Ross Frye.

68.     At all times relevant hereto, Gretchen Frye was notified by the news media of her son's passing from this life because of his suicide at the Allegheny County Jail.

69.     As a result of Decedent's death by suicide, Defendants Allegheny County, Harper, and Wainwright made the following determinations and/or changes and/or changes in staff:

  a.  Defendant CO Pristas and Defendant CO Ruffner were both suspended because of their conduct that day in performing their duties for the Allegheny County Jail;

  b.  The assistant nursing director was terminated because of her performance that day in regards to her duties for the Allegheny County Jail;

  c.  A memo was sent out on the day the Decedent Plaintiff hung himself which emphasized the need to make sure cut down tools and keys were on the correctional officer when making rounds;

  d.  A memo was sent out on the day the Decedent Plaintiff hung himself which emphasized that inmates must not be single celled in the intake pod 4A.

70.  As a direct and proximate result of the Defendants' conduct, Decedent suffered the following injuries:

  a.  Asphyxiation;

  b.  Strangulation;

  c.  Abrasions and contusions of the neck; and

  d.  Death.

48.  As a result of the death of her son, Plaintiff Gretchen Frye claims all appropriate damages under the Survivor Act, including but not limited to the following:

  a.)  Pain, suffering, and inconvenience;

  b.)  Anxiety, embarrassment and humiliation;

  c.)  Medical expenses;

  d.)  Funeral expenses; and

  e.)  Loss of earning capacity.

49.  As a result of the death of Decedent, Plaintiff Gretchen Frye claims all appropriate damages under the Wrongful Death Act, including but not limited to the following:

  a.)  Estate administration expenses;

  b.)  Medical expenses;

  c.)  Loss of society, companionship and services; and

d.)     Economic loss occasioned by the death of the Decedent.

## COUNT I – PLAINTIFF v. ALL DEFENDANTS PURSUANT TO 42 U.S.C. §1983

50.     The Plaintiff incorporates by reference the above paragraphs of the within Complaint the same as though set forth herein and at length.

51.     At all relevant times, Defendants were acting under color of the statutes, ordinances, regulations, customs and usages of Defendant ALLEGHENY COUNTY and under the authority of their offices as law enforcement officers.

52.     Defendants deprived Decedent of the rights, privileges, and immunities secured to him by 42 U.S.C. §1983 and by the Eighth and Fourteenth Amendments to the United States Constitution, as well as the rights, privileges and immunities provided to Decedent by the Pennsylvania state constitution.

53.     Decedent's injuries and damages were the direct and proximate result of the Defendants' conduct as follows:

a.)     In failing to recognize that the Decedent presented an objective and/or excessive risk of suicide;

b.)     In failing to respond properly or adequately to the objective and/or excessive risk of suicide posed by the Decedent;

c.)     In failing to properly monitor the Decedent;

d.)     In failing to request medical intervention by experienced medical personnel on the Decedent's behalf;

e.)     In failing to properly observe the condition of the Decedent while in custody;

f.)     In deliberately and willfully placing Decedent in a single cell without taking appropriate precautions to ensure his safety while in custody;

g.)     In failing to provide a safe environment that would have prevented Decedent's death by suicide;

h.)     In failing to acquire medical assistance for Decedent in a timely manner;

i.)    In failing to monitor the Decedent appropriately under the circumstances;

j.)    In failing to review information concerning issues related to suicide;

k.)    In failing to conduct the health receiving screen in a manner which would continuously alert them to suicidal behavior;

l.)    In failing to provide training in suicide training in the training programs for both Allegheny County Jail correctional and health care staff;

m.)    In failing to train their staff members who work with inmates to recognize verbal and behavioral cues which indicate the potential for suicide;

n.)    In failing to recognize that the Decedent as being potentially suicidal;

o.)    In failing to request an immediate evaluation of the patient through the nursing mental health staff on the medical/mental health Pods;

p.)    In allowing Decedent to be placed in the general population/intake in a single cell;

q.)    In failing to conduct the assessment of potentially suicidal inmates by qualified mental health professionals, trained to determine an inmate's level of suicide risk;

r.)    In failing to place the Decedent in the appropriate acute mental health housing unit;

s.)    In failing to provide regular and documented supervision of Decedent;

t.)    In housing the Decedent alone;

u.)    In failing to make the room where the Decedent passed away as nearly suicide proof as possible;

v.)    In failing to check on the Decedent every 15 minutes;

w.)    In failing to outline the procedures for referring potentially suicidal inmates and attempted suicides to mental health care providers or facilities;

x.)    In failing to provide procedures for communication between health care personnel and Allegheny County Jail correctional personnel regarding the status of the inmate in a clear, current and accurate fashion;

y.)    In failing to outline an intervention plan on how to handle a suicide;

z.)     In failing to have procedures in place to notify the Allegheny County Jail administrators, outside authorities and family members of potential, attempted or completed suicides of inmates;

aa.)     In failing to provide procedures of documenting the identification and monitoring of potential or attempted suicides of inmates;

bb.)     The intake correctional officers did not receive intensive training on suicide prevention;

cc.)     The intake correctional officers did not receive performance evaluations in order to assist them in the performance of their jobs;

dd.)     The intake correctional officers did not take "cut down" tools and/or keys with them on the rounds they made even though they knew that these tools are life-saving in either cutting down the victim or accessing the cell;

ee.)     The intake correctional officers did not do rounds every 15 minutes on the intake pod;

ff.)     The intake correctional officers single celled inmates in intake even though the Allegheny County Jail knew from previous litigation on Kindler and Simeone that no inmate should be single celled in intake due to suicide increased risk;

gg.)     The initial evaluation performed at intake did not convey the necessary information to the intake correctional officers in order to perform the appropriate suicide prevention policy.

hh.)     Reckless indifference to all inmates in pod 4A who were single celled which created a substantial risk of harm to all inmates who were single celled for suicide;

ii.)     In ignoring the notice given in Dr. Dixon's analysis;

jj.)     In failing to render first aid because of the failure to have cut down tools, keys and/or making the appropriate rounds.

54.     The Defendants' failure to recognize and respond to the objective and/or excessive risk of suicide posed by the Decedent while in the custody of the Defendants caused the Decedent's injuries and death.

55.     Defendants, in depriving Decedent of his constitutional rights, were intentional, negligent, recklessly indifferent, willful, wanton, malicious, and outrageous.

56.     Plaintiff also claims reasonable attorneys' fees and costs from Defendants as provided by 42 U.S.C. §1988.

WHEREFORE, the Plaintiff demands judgment against the Defendants for compensatory and punitive damages, together with court costs, attorneys' fees, interest, and all other relief permitted by the Court.  JURY TRIAL DEMANDED.

### COUNT II – PLAINTIFF v. DEFENDANT ALLEGHENY COUNTY, DEFENDANT HARPER, DEFENDANT J. DOE #1, DEFENDANT J. DOE #2, and DEFENDANT WAINWRIGHT PURSUANT TO 42 U.S.C. §1983

57.     The Plaintiff incorporates by reference the above paragraphs of the within Complaint the same as though set forth herein and at length.

58.     Decedent's injuries, death, and damages were a direct and proximate result of the Defendants' conduct as follows:

a.)     In failing to train properly individual corrections officers in safe methods of handling incarcerated persons;

b.)     In failing to train properly individual corrections officers in the monitoring of incarcerated persons under the care and custody of the Defendant ALLEGHENY COUNTY;

c.)     In failing to properly train individual corrections officers to provide medical intervention to persons under the care and custody of the Defendant ALLEGHENY COUNTY;

d.)     In failing to recognize that the Decedent's mental health needs prior to his incarceration may have rendered him more susceptible to injury and/or suicide;

e.)     In failing to supervise properly individual corrections officers;

f.)     In failing to train properly corrections officers in the recognition of objective and/or excessive suicide risk of persons under the care and custody of the Defendant ALLEGHENY COUNTY;

g.)     In failing to train properly corrections officers in suicide prevention of persons under the care and custody of the Defendant ALLEGHENY COUNTY;

h.)     In failing to train properly corrections officers in suicide risk assessment of persons under the care and custody of the Defendant ALLEGHENY COUNTY;

i.)     In failing to train properly corrections officers in responding to objective and/or excessive suicide risk in persons under the care and custody of the Defendant ALLEGHENY COUNTY;

j.)     In failing to review information concerning issues related to suicide;

k.)     In failing to conduct the health receiving screen in a manner which would continuously alert them to suicidal behavior;

l.)     In failing to provide training in suicide training in the training programs for both Allegheny County Jail correctional and health care staff;

m.)     In failing to train their staff members who work with inmates to recognize verbal and behavioral cues which indicate the potential for suicide;

n.)     In failing to recognize that the Decedent as being potentially suicidal;

o.)     In failing to request an immediate evaluation of the patient through the nursing mental health staff;

p.)     In allowing Decedent to be placed in the general population;

q.)     In failing to conduct the assessment of potentially suicidal inmates by qualified mental health professionals, trained to determine an inmate's level of suicide risk;

r.)     In failing to place the Decedent in the appropriate acute mental health housing unit;

s.)     In failing to provide regular and documented supervision of Decedent;

t.)     In housing the Decedent alone;

u.)     In failing to make the room where the Decedent passed away as nearly suicide proof as possible;

v.)      In failing to check on the Decedent every 15 minutes;

w.)      In failing to outline the procedures for referring potentially suicidal inmates and attempted suicides to mental health care providers or facilities;

x.)      In failing to provide procedures for communication between health care personnel and Allegheny County Jail correctional personnel regarding the status of the inmate in a clear, current and accurate fashion;

y.)      In failing to outline an intervention plan on how to handle a suicide;

z.)      In failing to have procedures in place to notify the Allegheny County Jail administrators, outside authorities and family members of potential, attempted or completed suicides of inmates;

aa.)      In failing to provide procedures of documenting the identification and monitoring of potential or attempted suicides of inmates;

bb.)      The intake correctional officers did not receive intensive training on suicide prevention;

cc.)      The intake correctional officers did not receive performance evaluations in order to assist them in the performance of their jobs;

dd.)      The intake correctional officers did not take "cut down" tools and/or keys with them on the rounds they made even though they knew that these tools are life-saving in either cutting down the victim or accessing the cell;

ee.)      The intake correctional officers did not do rounds every 15 minutes on the intake pod;

ff.)      The intake correctional officers single celled inmates in intake even though the Allegheny County Jail knew from previous litigation on Kindler and Simeone that no inmate should be single celled in intake due to suicide increased risk;

gg.)      The initial evaluation performed at intake did not convey the necessary information to the intake correctional officers in order to perform the appropriate suicide prevention policy.

hh.)      Reckless indifference to all inmates in pod 4A who were single celled which created a substantial risk of harm to all inmates who were single celled for suicide;

ii.)      In ignoring the notice given in Dr. Dixon's analysis;

      jj.)    In failing to render first aid because of the failure to have cut down tools, keys and/or making the appropriate rounds.

59.    The actions of the individual corrections officers as aforesaid resulted from and were taken pursuant to a policy, practice, and/or custom of the Defendant ALLEGHENY COUNTY, which policy, practice and/or custom is implemented by individual corrections officers.

60.    Defendant ALLEGHENY COUNTY had approved and condoned the procedures implemented by and enforced by the individual correctional officers.

61.    The Defendants' failure to recognize or respond to the objective and/or excessive risk of suicide presented by the Decedent while in the care and custody of the Defendant ALLEGHENY COUNTY caused his injuries and death.

62.    Plaintiff also claim reasonable attorneys' fees and costs from Defendants as provided for by 42 U.S.C. §1988.

WHEREFORE, the Plaintiff demands judgment against the Defendants for compensatory and punitive damages, together with court costs, attorneys' fees, interest, and all other relief permitted by the Court.  JURY TRIAL DEMANDED.

## COUNT III – PLAINTIFF v. ALL DEFENDANTS

63.    The Plaintiff incorporate by reference the above paragraphs of the within Complaint the same as though set forth herein and at length.

64.    The following individuals are eligible to recover damages as a result of the Decedent's death pursuant to Pa. C.S.A. §8301:

      a.)    Tiffany Frye

      b.)    Ross Frye, Jr.

      c.)    Kayla Frye

d.)     Dasia Frye, a minor

65.    During his lifetime, Decedent did not commence any action for the injuries that caused his death and no other action has been filed to recover damages for the wrongful death of Decedent.

66.    At all relevant times, Defendants conducted themselves in a careless, reckless indifferent, and negligent manner, and acted with reckless indifference to the rights of the Decedent generally and in the following particulars:

a.)     In failing to recognize that the Decedent presented an objective and/or excessive risk of suicide;

b.)     In failing to respond properly or adequately to the objective and/or excessive risk of suicide posed by the Decedent;

c.)     In failing to properly monitor the Decedent;

d.)     In failing to request medical intervention by experienced medical personnel on the Decedent's behalf;

e.)     In failing to properly observe the condition of the Decedent while in custody;

f.)     In deliberately and willfully placing Decedent under arrest without taking appropriate precautions to ensure his safety while in custody;

g.)     In failing to provide a safe environment that would have prevented Decedent's death by suicide;

h.)     In failing to acquire medical assistance for Decedent in a timely manner;

i.)     In failing to monitor the Decedent appropriately under the circumstances;

j.)     In failing to train properly individual corrections officers in safe methods of handling incarcerated persons;

k.)     In failing to train properly individual corrections officers in the monitoring of incarcerated persons under the care and custody of the Defendant ALLEGHENY COUNTY;

l.)   In failing to properly train individual corrections officers to provide medical intervention to persons under the care and custody of the Defendant ALLEGHENY COUNTY;

m.)   In failing to recognize that the Decedent's alcohol consumption prior to his arrest may have rendered him more susceptible to injury and/or death;

n.)   In failing to supervise properly individual corrections officers;

o.)   In failing to train properly corrections officers in the recognition of excessive and/or objection suicide risk of persons under the care and custody of the Defendant ALLEGHENY COUNTY;

p.)   In failing to train properly corrections officers in suicide prevention of persons under the care and custody of the Defendant ALLEGHENY COUNTY;

q.)   In failing to train properly corrections officers in suicide risk assessment of persons under the care and custody of the Defendant ALLEGHENY COUNTY;

r.)   In failing to train properly corrections officers in responding to objective and/or excessive suicide risk in persons under the care and custody of the Defendant ALLEGHENY COUNTY;

s.)   The intake correctional officers did not receive intensive training on suicide prevention;

t.)   The intake correctional officers did not receive performance evaluations in order to assist them in the performance of their jobs;

u.)   The intake correctional officers did not take "cut down" tools and/or keys with them on the rounds they made even though they knew that these tools are life-saving in either cutting down the victim or accessing the cell;

v.)   The intake correctional officers did not do rounds every 15 minutes on the intake pod;

w.)   The intake correctional officers single celled inmates in intake even though the Allegheny County Jail knew from previous litigation on Kindler and Simeone that no inmate should be single celled in intake due to suicide increased risk;

x.)   The initial evaluation performed at intake did not convey the necessary information to the intake correctional officers in order to perform the appropriate suicide prevention policy.

24

y.)      Reckless indifference to all inmates in pod 4A who were single celled which created a substantial risk of harm to all inmates who were single celled for suicide;

z.)      In ignoring the notice given in Dr. Dixon's analysis;

aa.)      In failing to render first aid because of the failure to have cut down tools, keys and/or making the appropriate rounds.

67.      As the direct and proximate result of the Defendants' negligence, the Plaintiff and entitled persons have suffered the following damages:

a.)      Funeral expenses of the Decedent;

b.)      Expenses of administration related to the Decedent's injuries;

c.)      The loss of contribution, support, consortium, comfort, counsel, aid, association, care and services of the Decedent;

d.)      Medical expenses incidental to treatment of the Decedent for his injuries and subsequent death;

e.)      Such other damages as are permissible in the wrongful death action;

f.)      Other losses and damages recoverable under 42 Pa. C.S.A. §8301.

68.      As a direct and proximate result of the previously described outrageous, reckless, negligent, willful, wanton, and/or intentional conduct of the Defendants, Plaintiff seeks punitive damages on behalf of the persons identified herein.

WHEREFORE, the Plaintiff demands judgment against the Defendants for compensatory and punitive damages, together with court costs, attorneys' fees, interest, and all other relief permitted by the Court.  JURY TRIAL DEMANDED.

## <u>COUNT IV – PLAINTIFF v. ALL DEFENDANTS – SURVIVAL ACTION</u>

69.      The Plaintiff incorporates by reference the above paragraphs of the within Complaint the same as though set forth herein and at length.

70.     The Plaintiff brings this survival action pursuant to 20 Pa.C.S.A. §3373 and 42 Pa.C.S.A. §8302.

71.     As the direct and proximate result of the Defendants' negligence, the Defendants, and each of them, are liable for the following damages:

a.)    Decedent 's pain and suffering between the time of the Defendants' negligence and time of the Decedent's death;

b.)    Decedent's total estimated future earning power, less his estimate cost of personal maintenance;

c.)    Decedent's loss of retirement and Social Security income;

d.)    Decedent 's other financial losses suffered as a result of his death;

e.)    Decedent's loss of the enjoyment of life.

WHEREFORE, the Plaintiff demands judgment against the Defendants for compensatory and punitive damages, together with court costs, attorneys' fees, interest, and all other relief permitted by the Court.  JURY TRIAL DEMANDED.

## COUNT V – PLAINTIFF v. DEFENDANT ALLEGHENY COUNTY

72.     The Plaintiff incorporates by reference the above paragraphs of the within Complaint the same as though set forth herein and at length.

73.     Pursuant to 42 Pa. C.S.A. §8548, Defendant ALLEGHENY COUNTY is the indemnitor of its employees, the individual corrections officers, for the payment of any judgment for damages resulting from a judicial determination that an act of either or any of individual corrections officers was the cause and their actions were within the scope of their duties as corrections officers.

74.     Plaintiff is therefore entitled to recover payment from the Defendant ALLEGHENY COUNTY for any judgment against the individual Defendant corrections officers arising from the prior counts of this Complaint.

26

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory and punitive damages, together with court costs, attorneys' fees, interest, and all other relief permitted by the Court.  JURY TRIAL DEMANDED.

## **JURY DEMAND**

PLAINTIFF REQUESTS THAT ALL ISSUES THAT MAY BE DETERMINED BY A JURY BE TRIED BY A JURY.

Respectfully submitted,

BY:    s/ Steven M. Barth
Steven M. Barth, Esquire
Pa. I.D. #89395
P.O. Box 23627
Pittsburgh, PA 15222
smbassociates@gmail.com
Attorneys for the Plaintiff

BY:    /s/  Jonathan M. Gesk
Jonathan M. Gesk, Esquire
Gesk Moritz, LLC
Pa. I.D. #205678
14 E. Main Street
Carnegie, PA, 15106
jgesk@gesklaw.com
(412) 429 – 9100 (PH)
Attorneys for the Plaintiff